**AFFIRMED as MODIFIED and Opinion Filed June 14, 2023**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-21-00668-CR**

**JEFFERY MICHAEL WINEBERG, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 366th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 366-83346-2020**

# MEMORANDUM OPINION

Before Chief Justice Burns, Justice Smith, and Justice Breedlove
Opinion by Justice Smith

A jury convicted appellant Jeffery Michael Wineberg of continuous sexual abuse of a child, a first-degree felony. *See* TEX. PENAL CODE ANN. § 21.02(b), (h). The trial court assessed his punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. For the reasons discussed below, we overrule appellant's eight issues challenging his conviction, sustain the State's cross-issue regarding modification of the judgment, and affirm as modified the judgment of the trial court.

## Background

Appellant was the stepfather of the victim, E.N. Appellant began dating the victim's mother in 2017. Because E.N.'s mother worked during the day and appellant mainly worked from home, E.N. was often home alone with appellant. The first time E.N. remembered appellant sexually abusing her was in the summer between fifth and sixth grade. She was eleven years old at the time. The abuse continued until she was thirteen. One night, after appellant told her he was going to visit her the next morning, E.N. set up her iPad to record the sexual abuse. She played the audio recording for her stepsister a few days later, and then played it for her mother. Shortly after E.N. played the recording for her mother, she told appellant's father that appellant was sexually abusing her. Appellant's father called the police and an investigation ensued.

E.N. and her stepsister were transported to the Children's Advocacy Center where they were forensically interviewed. E.N. subsequently underwent a medical examination that showed there was physical evidence, consistent with a penetrating event. Appellant was arrested and convicted for continuous sexual abuse of a child. This appeal followed.

## Sufficiency of the Evidence

We will first address appellant's eighth issue in which he argues that the evidence was insufficient to support his conviction of continuous sexual abuse of a child under the age of fourteen. We address this issue first because, if meritorious,

it would provide appellant with the greatest relief—an acquittal. *See Chaney v. State*, 314 S.W.3d 561, 565 (Tex. App.—Amarillo 2010, pet. ref'd).

In reviewing the legal sufficiency of the evidence, we consider whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We review the evidence in the light most favorable to the verdict and defer to the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Jackson*, 443 U.S. at 319; *see also Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Isassi*, 330 S.W.3d at 638. When conducting a legal sufficiency review, we consider all evidence in the record regardless of whether it was properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). A criminal conviction may be supported by both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence. *Id.* "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

A person commits the offense of continuous sexual abuse of a child if the person commits two or more acts of sexual abuse, during a period that is thirty or more days in duration, against a child victim that is younger than fourteen years of age. TEX. PENAL CODE § 21.02(b). The indictment in this case included the following acts of sexual abuse as authorized by section 21.02(c)(4) of the penal code, *see also id.* § 22.021(a)(1)(B)(i, iii–iv), (a)(2)(B): aggravated sexual assault of a child under fourteen years of age by intentionally and knowingly (1) causing the female sexual organ of E.N. to contact the male sexual organ of the defendant, (2) causing the anus of E.N. to contact the male sexual organ of the defendant, or (3) causing the penetration of the female sexual organ of E.N. by defendant's finger. It is well established that a child victim's testimony alone is sufficient to support a conviction for continuous sexual abuse of a child. TEX. CODE CRIM. PROC. ANN. art. 38.07; *Garner v. State*, 523 S.W.3d 266, 271 (Tex. App.—Dallas 2017, no pet.).

E.N. was the final witness called by the State. She testified that the first time she remembered appellant doing something to her that made her feel uncomfortable was when he asked her if they could snuggle in his room. It was summer and E.N. had just completed fifth grade. They had snuggled before, but this time was different. E.N. told him yes, and he took her to his bed. They lay there for a few minutes, they were on their sides with appellant lying behind her, and then he asked her to roll over on her back. Once she rolled over, he got on top of her. E.N. asked him what he was doing, and he said "snuggling." Appellant began to rub his penis

–4–

on her vagina; it was uncomfortable. They were wearing clothes and he moved up and down over her body.

Another time, before they went to a college football game, appellant tried to penetrate her vagina with his penis. Similar incidents would occur frequently and when she was home alone with appellant. On another occasion, appellant tried to penetrate her anus with his penis.

One night, appellant told her he would visit her the next day. He had never told her that before, but she knew it meant that he was going to abuse her. Before she went to sleep, she set up her iPad to record and hid it in a cubby in her room. The next morning, he came into the bedroom and asked her to take off her clothes. He then rubbed his penis on her vagina. She was lying on her back with her feet dangling off the bed, and he was standing next to the bed. Her legs were on his shoulders or she was holding them. She was also holding a cat stuffed animal. After "he was finished," he went to Wal-Mart to get a pill. When he came back, he said the pill would not work unless "a second sperm got in," so he sexually abused her again.

A.W., E.N.'s stepsister, testified that E.N. came into her room and told her something about appellant and E.N. that made her concerned. Appellant was A.W.'s biological father. At first, A.W. thought it was a prank or a joke because she did not think her father would do such a thing. She realized it was not a joke when E.N. played her a voice recording of something that happened the week prior. The

recording was on E.N.'s iPad. A.W. let E.N. sleep in her room that night and hid E.N.'s iPad under her pillow to keep it safe. The next morning, they played the recording for E.N.'s mother. About halfway through, appellant walked in and asked what was going on. When he heard the recording, he took the iPad and said, "This is ridiculous." He deleted the recording and told E.N.'s mother they would talk about it later.

Police recovered the deleted recording, and it was played for the jury. In the recording, E.N. can be heard crying; saying, "It hurts," on multiple occasions; and asking him to stop. Appellant tells her repeatedly to "relax." Approximately fifteen minutes of the recording clearly depicts forcible sexual contact by appellant.

In referring to the recording, when asked by the State what the "rhythmic creaking" sound was, E.N. testified, "From the bed." When asked what the "skin slapping" sound was, she answered, "[W]hen he is in." She also testified that he hit her more than once during the incident.

During appellant's interview with police, appellant admitted that he had touched E.N.'s "girly parts" because she had a lice problem and he was helping remove the lice. He explained the recording was of him tickling or wrestling with E.N. and that he accidentally deleted it when he took the iPad away from E.N.'s mother. A search of appellant's phone also revealed incriminating internet searches relating to pregnancy and Plan B.

Rachel McConnell, the forensic interviewer that spoke with E.N. at the Children's Advocacy Center, testified as an outcry witness. According to McConnell, E.N. reported that the abuse started when she was eleven or twelve years old during the summer between fifth and sixth grade and ended when she was thirteen years old. E.N. described multiple incidents of abuse to McConnell, which McConnell detailed to the jury. These included appellant using his fingers and his penis to touch her vagina, appellant penetrating her vagina with his penis, and appellant touching her anus with his penis.

Sandra Onyinanya, a Pediatric Nurse Practitioner in the Referral and Evaluation of At Risk Children (REACH) Clinic at Children's Medical Center of Dallas, testified that she completed a physical examination of E.N. In her training and experience, it was common for a child alleging sexual abuse to present with no type of injury or trauma because the tissue that is in the genital area heals very quickly. In this case, however, E.N. presented with a healed transection in a particular area of her hymen, meaning that there had been a complete loss of tissue to the hymen in that area, which was consistent with a prior penetrating event.

Defense counsel questioned Onyinanya and E.N. about whether the loss of tissue to the hymen could have been from hitting her private area on her bike seat or handlebars in a crash, but E.N. did not remember what she injured in the crash and Onyinanya explained that was only possible if something on the bike penetrated the hymen. Defense counsel also questioned E.N. about a number of internet searches

linked to her Yahoo and Google account, as well as two chat conversations with other account holders on Movie Star Planet, that indicated E.N. may have lied about the allegations. E.N. denied having the conversations on her Movie Star Planet account and denied making any of the internet searches. However, E.N. did admit that several months after her outcry she told the school counselor that the abuse did not happen because she thought her mother was going to get in trouble, even arrested. When asked on cross-examination why she went to the counselor, she responded, "I didn't know who else to go to." The counselor testified that E.N. came to see her and asked the counselor if she knew what happened to her. E.N. then told the counselor that she made the whole thing up. After E.N.'s recantation, McConnell conducted a second forensic interview. McConnell testified that E.N. did not recant during the second forensic interview.

Appellant argues that the evidence is legally insufficient to support a conviction for continuous sexual abuse of a child because there was evidence that E.N.'s allegations were false, that she tried to take the allegations back, that she reported she was chaste during her Church of Latter-Day Saints temple recommendation interview, and that he denied the abuse. However, each of these challenges to the evidence attack the jury's credibility determinations, which we must defer to on appeal as the jury is the sole judge of the credibility of the witnesses and the weight of their testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The jury may choose to believe or disbelieve any part of any witness's

–8–

testimony.  *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000).  "When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Clayton*, 235 S.W.3d at 778.

Although appellant raised questions to E.N.'s credibility at trial, the jury was free to believe her allegations of abuse.  The evidence showed that the abuse started when E.N. was eleven and ended when she was thirteen.  E.N. described multiple instances throughout the two-year period in which appellant caused her sexual organ and her anus to contact his sexual organ.  Furthermore, the jury was able to hear firsthand one incident of abuse through the iPad recording.  Having reviewed the evidence in the light most favorable to the jury's verdict, we conclude that any rational trier of fact could have found beyond a reasonable doubt that appellant committed two or more acts of sexual abuse against E.N. during a period that was thirty or more days in duration.  We overrule appellant's eighth issue.

### Exclusion of Extrinsic Impeachment Evidence

In his first issue, appellant argues the trial court erred by refusing to admit Defendant's Exhibit Nos. 9 and 10, which were printouts of two chat conversations in E.N.'s Movie Star Planet account with other account holders.  Appellant contends that these represent prior inconsistent statements and show that E.N.'s allegations against appellant were false.

The State responds that appellant failed to authenticate Exhibit Nos. 9 and 10 through E.N.'s testimony because she testified that her accounts had been hacked before, there was a similar fabrication incident on one of her accounts, and she did not send the messages; thus, the trial court did not err in excluding them.

In his second issue, appellant argues the trial court erred by refusing to admit Defendant's Exhibit No. 5, which was a printout of internet searches on E.N.'s Google account related to lying to the police. Appellant argues that, although E.N. denied performing the internet searches, she confirmed the printout contained her web search history thus authenticating the printout. Additionally, the State informed the trial court that it had no objection to the admission of the printout and simply requested a limiting instruction for impeachment purposes. Therefore, appellant argues, the trial court erred in refusing its admission.

As to Defendant's Exhibit No. 5, the State responds that appellant did not obtain a ruling on its admissibility and, instead, asked if he could "publish" the exhibit before it was admitted. The State further argues that appellant also failed to authenticate Exhibit No. 5 because E.N. denied making the searches.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We reverse a trial court's ruling only if it is outside the "zone of reasonable disagreement." *Id.* If a trial court's decision is correct under any

theory of law applicable to the case, we will uphold it. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

The trial court first considered Defendant's Exhibit Nos. 5, 9, and 10 at a pretrial hearing in which the trial court considered multiple exhibits appellant sought to admit at trial. At the beginning of the hearing, the trial court noted, "I am not certain about the authentication of these exhibits, and so my current focus is not on whether or not the Court believes that these exhibits are admissible or will be admitted as evidence. The question before the Court today at this pre-trial hearing is whether or not the Court will allow them for impeachment purposes." E.N. confirmed that the email address associated with the searches in Exhibit No. 5 was her Gmail account, but she denied doing any of the Google searches listed or any searches about accusations in this case. She also testified that she had six or seven Movie Star Planet accounts between 2017 and 2021. When presented with Exhibit Nos. 9 and 10—screenshots of chat messages from one of her Movie Star Planet accounts—E.N. testified that she did not remember whether she had any conversations with the username shown in Exhibit No. 9 or the username shown in Exhibit No. 10. Neither conversation was familiar to her, and she testified that those were not her messages even though the chat dialogue was from her account.

The evidence further showed that, at one point, appellant knew some of E.N.'s passwords, but E.N. had changed them since he was arrested. E.N.'s mother also knew her passwords to her email account, but E.N. denied that her mother knew her

–11–

password to her Movie Star Planet account. The trial court asked E.N. how the searches got on her account if it was not her. She responded that "[s]omeone had access to it." When asked who else had access to the account, she said, "No one. Just me. But I don't know how other people got to them." E.N.'s mother denied conducting any of the searches.

As to her Movie Star Planet accounts specifically, E.N. testified that one of her Movie Star Planet accounts got hacked in 2018 or 2019, and she was locked out of the account. Appellant had to call and reset it. E.N. also hacked someone else's Movie Star Planet account. E.N.'s mother testified that E.N. told her one of her Movie Star Planet accounts had been hacked and showed her a chat in which E.N.'s username was claiming that she lied about being "violated" by appellant. E.N. was consistent that she did not have that conversation on Movie Star Planet. E.N.'s mother also testified that E.N.'s school contacted her about how someone had gone into E.N.'s school account and changed things around regarding her class schedule.

At the close of the hearing, the trial court ruled that it would allow defense counsel to use this evidence for impeachment purposes at trial in a similar fashion as it had been presented at the pretrial hearing, i.e. in question and answer format. The trial court commented that the jury would be in the best position to determine the credibility of the witnesses.

At trial, A.W. testified that she also had Movie Star Planet accounts and that she and E.N. chatted on there quite often. She denied that either of the accounts in

–12–

question on Exhibit Nos. 9 and 10 were hers. She also acknowledged that she had hacked other people's accounts for fun. When asked if hacking other people's accounts was easy to do, she responded, "Oh, my gosh, all you had to do was talk," meaning chat about exchanging things through the accounts, which resulted in the other person providing their username and password. She and E.N. never talked about what happened with appellant on Movie Star Planet.

When E.N. testified, the trial court allowed defense counsel to question E.N. about the internet searches and the messages on her Movie Star Planet account. E.N. confirmed that each of the accounts in question were hers and that the passwords were changed after appellant was arrested, preventing him from having access at the time of the searches and messages. Defense counsel asked her whether she had ever searched for the following, to which E.N. answered, "No" to each question:

- How to testify in front of a jury

- Can kids get in trouble for lying to the police*

- Practicing lying so a jury believes you

- What does perjury mean

- How to make a lie sound convincing*

- Making others believe when you lie*

- Lying to the police to get someone in trouble*

- How to get out of testifying because I lied to the police*

- If I lied to the police because I felt pressure*

–13–

- Can I refuse to appear in court if I lied on a witness statement*

- If I don't want to testify against a person, can the law make me*

- What should I do because I don't want to go to court to testify*

- Can I be forced to testify as a witness in court*

- Tips for testifying in court*

- I don't want to testify, do I have to*

- Will a jury believe me because I'm a child*

After E.N. denied searching any of these phrases, defense counsel showed her Exhibit No. 5, which showed searches for or visits to pages containing the starred phrases listed above, as well as other exhibits not at issue on appeal. Defense counsel then moved to admit the exhibits, including Exhibit No. 5. When the court asked whether there was an objection, the prosecutor responded, "The State would just ask for the limiting instruction that this only be used for impeachment purposes only." The trial court then summoned the attorneys for an off-the-record discussion but made no ruling on the record as to the admission of the exhibits. Defense counsel then confirmed with E.N. the substance of each exhibit he had offered and asked to publish. The trial court responded, "No." At that point, the trial court had not admitted any of the exhibits appellant sought to publish, and defense counsel made no further attempts to admit them.

Because appellant never obtained a ruling from the trial court on the record regarding the admission of Exhibit No. 5, appellant has not preserved his challenge

to the trial court's exclusion of Exhibit No. 5 for appellate review. *See* TEX. R. APP. P. 33.1(a)(2). Therefore, we overrule appellant's second issue.

After denying appellant's request to publish certain exhibits, defense counsel questioned E.N. about her Movie Star Planet accounts. He showed her Defense Exhibit Nos. 9 and 10, which portrayed chat messages with two other account holders. E.N. confirmed that the sender's account name and avatar shown on the printout of the messages were hers. As with the search history, defense counsel was allowed to question E.N. on whether she sent the following messages:

- I would lie to make my stepdad go away

- I lied to the police, he never did anything to me

- He went to jail and now I got my mom back

- I feel bad but I don't feel bad

- I made them think that he did bad things to me so he never comes back

- I lied to my mom, too, so she would believe me

- I lied to CPS too

- They all believe me even though he never did anything bad to me

- I had my sister lie too

- I told the counselor at school he didn't do it but the State lady was called and she said I was lying so I got scared

- I didn't know why they wouldn't believe me so I decided to keep my same story

–15–

E.N. denied sending each message. Defense counsel then moved to admit Exhibit Nos. 9 and 10, and the State objected. The trial court sustained the State's objection.

The rules of evidence permit questioning a witness about alleged prior inconsistent statements if certain requirements are met. TEX. R. EVID. 613(a). First, the party must tell the witness the contents of the statement, the place and time of the statement, and the person to whom the witness made the statement. TEX. R. EVID. 613(a)(1). Then the witness must be given an opportunity to explain or deny the statement. TEX. R. EVID. 613(a)(3). If the witness fails to unequivocally admit making the statement, extrinsic evidence of the witness's prior inconsistent statement is admissible. TEX. R. EVID. 613(a)(4). However, if the extrinsic evidence cannot be authenticated as the witness's statement, it has no relevance and, thus, is inadmissible. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012).

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a). When it comes to electronic writings, the Court of Criminal Appeals has explained that the writing may be authenticated by presenting evidence sufficiently linking the writing to the purported author. *Tienda*, 358 S.W.3d at 639. This can be accomplished in a number of different ways such as by the sender admitting authorship, a witness to its composition, evidence that the message originated with the purported sender's

electronic device, or by the communication itself in that it contains information that only the purported sender would know. *Id.* at 639–41. The Court of Criminal Appeals has also recognized that "the provenance of such electronic writings can sometimes be open to question—computers can be hacked, protected passwords can be compromised, and cell phones can be purloined." *Id.* at 641. Therefore, the Court explained:

> That an email on its face purports to come from a certain person's email address, that the respondent in an internet chat room dialogue purports to identify himself, or that a text message emanates from a cell phone number assigned to the purported author—none of these circumstances, without more, has typically been regarded as sufficient to support a finding of authenticity.

*Id.* at 641–42.

In this case, we cannot conclude that the trial court abused its discretion in sustaining the State's objection to the admission of Exhibit Nos. 9 and 10. Although E.N. confirmed that the account in which the messages appeared was hers, she denied sending any of the messages and did not recognize the usernames of the other people in the chat. Additionally, there was evidence that E.N.'s Movie Star Planet account had been hacked before, as well as her school account, and that she had hacked other people's accounts. According to her stepsister, hacking an account was easy to do. Appellant offered no other evidence to authenticate the messages such as evidence that the messages originated on one of E.N.'s devices or a comparison of language used in other message E.N. admitted to sending showing that the author

–17–

was the same person.  We recognize that the subject matter of the messages themselves could be sufficient to authenticate the communication; however, these messages do not contain specific details about the abuse that only E.N. would know. By this time, multiple people knew that E.N. accused her stepfather of doing bad things to her, that the police were involved, and that she tried to tell the counselor that it was not true.  Based on the totality of the evidence, the trial court could have concluded that appellant failed to authenticate the messages as prior inconsistent statements made by E.N.  *See, e.g.*, *Walcott v. State*, No. 03-20-00124-CR, 2021 WL 2021139, at *7–8 (Tex. App.—Austin May 21, 2021, pet. ref'd) (mem. op., not designated for publication) (concluding it was not outside the zone of reasonable disagreement for the trial court to exclude a Facebook message as a prior inconsistent statement because the defendant failed to sufficiently authenticate the message when there was evidence the purported author's Facebook account had been hacked and shutdown, the message contained information describing the crime that would have been known to others by that time, and there were no speech or writing patterns that were unique to, or similar messages sent by, the purported author).  Therefore, we overrule appellant's first issue.

## Admission of Audio Recording

Appellant argues in his third issue that the trial court abused its discretion by admitting the audio recording of appellant sexually abusing E.N. because the State

–18–

failed to establish the proper predicate foundation for admitting a digitally enhanced recording. We disagree.

Appellant relies on *Angleton v. State*, 971 S.W.2d 65 (Tex. Crim. App. 1998) as authority for the admissibility requirements of a digitally enhanced recording. In *Angleton*, the Court of Criminal Appeals explained that the authentication question for the enhanced audio recording offered for admission had three parts: (1) whether the "enhanced" copy accurately depicted the contents of the original recording; (2) whether the voices on the tape are those who the proponent said they were; and (3) "whether the depiction of the conversation on the tape as a continuous conversation between the participants is accurate (i.e. the conversation on the tape is not the result of splicing or some other alteration)." 971 S.W.2d at 67.

Appellant argues that the State could not prove prong one or three because the original recording was not available due to E.N. editing the recording. However, the Court in *Angleton* made clear that it was not setting out a three-part test but was "merely observ[ing] that the authentication question in the present case appears to implicate three of the examples of authentication at three different levels." *Id.* at 67 n.3. The Court cautioned, "Nothing in this opinion should be construed as limiting the ability of the parties to establish authentication in accordance with the plain language of Rule 901." *Id.*

In this case, E.N. testified that one night, after appellant told her he would visit her the next day, she set up her iPad to record because she knew this meant he was

going to sexually abuse her again. She started the recording and hid the iPad in a cubby in her room. She went to sleep while the iPad was recording. The next morning, appellant came into her room and sexually assaulted her. A few days later, E.N. played the recording for her stepsister and then her mother. At trial, the recording offered into evidence was twenty-nine minutes long. The original recording, which was seven or eight hours long, was no longer available. It is not clear from the record when E.N. condensed the original recording to the twenty-nine-minute recording. However, when asked if she made any changes to the recording aside from shortening its length, E.N. responded, "No." Additionally, A.W. testified that the other parts of the recording were just "blank sound."

The evidence also showed that when appellant heard E.N. playing the recording for her mother, he grabbed the iPad and tried to delete it. Police were subsequently able to recover it. Investigator Chris Meehan with the Collin County District Attorney's Office testified he obtained a warrant to search the iPad. He took the iPad to the Allen Police Department where he watched Detective Compton make an image of the iPad with a program called GrayKey. The program is able to get a full file system image that can then be opened with Cellebrite, a software program that allows you to search the contents of the device. Investigator Meehan found an audio file titled "new recording.m4a" that was twenty-nine minutes and ten seconds in length. He testified that deleted items may be overwritten and that he did not find

the remainder of the recording. His understanding was E.N. condensed it in some way because most of the time she was sleeping.

Mark Porter, a forensic video analyst for the Tarrant County District Attorney's Office, testified that he was contacted to assist in enhancing the audio on the recording. He used a program called iZotope (a cyber-repair software) to adjust the volume of certain portions of the recording so that the audio of the voices was clearer. He did not delete anything off the recording itself. Porter also testified that the recording was twenty-nine minutes when he received it. In his opinion, eliminating some of the frequencies did not affect the overall veracity of the evidence. "It just allows the audio to be heard more clearly . . . . You don't have to strain to understand what is being said."

E.N. identified both her and appellant's voice on the two recordings before the court. According to E.N., the only difference between the recordings was that one was louder than the other; nothing sounded altered from the recording that she made.

Based on the totality of the evidence, we conclude that the trial court did not abuse its discretion in admitting the recording. E.N. and A.W. sufficiently explained why the recording was only twenty-nine minutes, instead of seven or eight hours. Investigator Meehan and Porter explained the programs they used to recover and enhance the audio and that neither changed the substance of the recording. *See* TEX. R. EVID. 901(b)(9) (providing that "[e]vidence describing a process or system and

–21–

showing that it produces an accurate result" can satisfy the authentication requirement).  And, E.N. authenticated the recording by testifying that she made it, that nothing had been altered since Porter enhanced it, and that she recognized her and appellant's voices.  *See* TEX. R. EVID. 901(b)(1), (5) (providing that "[t]estimony that an item is what it is claimed to be" or "[a]n opinion identifying a person's voice--whether heard firsthand or through mechanical or electronic transmission or recording--based on hearing the voice at any time under circumstances that connect it with the alleged speaker" can satisfy the authentication requirement).  The non-enhanced recording was also admitted into evidence.  Moreover, there is no evidence suggesting that the twenty-nine minute audio was itself spliced or altered in any substantive way.  Any argument that the audio was not a complete recording of the incident goes to the weight of the evidence, not its admissibility.  *See, e.g.*, *Manis v. State*, No. 05-08-00459-CR, 2009 WL 1815468, at *10 (Tex. App.—Dallas June 26, 2009, no pet.) (not designated for publication) ("appellant's complaint that the surveillance recordings are 'not an accurate and complete video of the surveillance . . .' goes to the weight of the evidence only and not to its admissibility").  Appellant's third issue is overruled.

**Motion to Suppress Evidence Recovered from Appellant's Phone**

In his fourth issue, appellant contends the trial court erred by denying his motion to suppress evidence retrieved from his illegally seized cell phone.  The State offers no explanation for the seizure and, instead, proceeds to a harm analysis.

–22–

Therefore, assuming without deciding that the trial court erred in denying appellant's motion to suppress and in admitting information from the contents of his illegally seized phone,[1] we turn to whether such constitutional error was harmful. *See Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001) ("the harm analysis for the erroneous admission of evidence obtained in violation of the Fourth Amendment must be Rule 44.2(a)'s constitutional standard"). Unless we determine beyond a reasonable doubt that the error did not contribute to the conviction, we must reverse the judgment. TEX. R. APP. P. 44.2(a). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We focus on the error's probable impact in light of the other evidence presented at trial and ask whether there is "a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Id.*

We first begin with the evidence admitted from appellant's phone. The extraction from appellant's phone revealed a search on YouTube for "how sperm travels to the egg," as well as two videos titled, "Sperm Journey To Ovum Fertilization / Sperm And Egg Fertilization Video / Parents" and "Intrauterine

---

[1] *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963) (evidence seized during an unlawful search, as well as the fruits of the illegally seized evidence, may not be used against the victim of the illegal search and seizure in a criminal proceeding).

–23–

Device (IUD)." The extraction also showed the following Google searches: "planned parenthood confidentiality," "Can Planned Parenthood tell your parents?" and "does planned parenthood do iuds." Each of these searches was made within a few days of the last incident of sexual abuse reported by E.N. On June 21, 2019, approximately two-and-one-half hours after E.N. played the recording for her mother and two hours before the case was reported, there was a Google search for "Southwest Airlines," which resulted in a visit to the "bookings" page of Southwest's website. There were also Google searches on June 21 for "losing hymen bike seat," "plan b and blood work," "plan b and drug test," "plan b trace in blood urine analysis," "how long does plan b stay in your body," "what can blood work tell you," "collin county police reports," and "Crime reports for Collin County, TX."

On cross-examination, Detective Shoemake conceded that the searches could have been made by E.N., not appellant, and that appellant's father could have been looking to change his flight or book a flight after he learned about the recording.

The State contends that appellant's conviction was supported by such overwhelming evidence that any error in the admission of appellant's web search history was harmless beyond a reasonable doubt. We agree.

There is no question that the internet searches on appellant's phone are incriminating, especially in light of their proximity to the last incident of abuse and E.N.'s outcry. And, the State highlighted the incriminating nature of the searches to

–24–

the jury in its closing argument and encouraged the jury to go back and look at the dates of the searches. The State argued that the searches showed appellant "was trying to see how much evidence could be found."

In a typical "he said, she said" sexual abuse case we could likely not conclude that the error of including this evidence was harmless beyond a reasonable doubt. But this was not a typical case relying solely on the credibility of the victim to prove the State's allegations. In addition to E.N.'s testimony, the jury was able to hear firsthand an incident of sexual abuse. For twenty-nine minutes, the jury listened to appellant forcing E.N. to have sex with him. And the jury heard that E.N. suffered loss of tissue to an area of her hymen that was consistent with a penetrating event.

We include the following portion of what appellant can be heard saying on the iPad recording to show the overwhelming nature of the evidence presented. It is explicit and cannot be mistaken for anything but sexual assault.

- "Relax, stop pushing on me."

- "You're getting antsy and you're pushing on me and it's really irritating me."

- "I'm already in. I'm already in. I'm already in."

- "Hey just try to relax and get through this first part. Please. Hold on to your friend. Just relax and stop kicking me back. The less you do . . . make it to where I can't concentrate. Thank you. Just relax."

- "Move your hands because every time I do this you're using it as a brace. I gotta see what I'm doing."

- "I need you back where I had you.  Please.  And just relax now.  Relax your legs.  Relax them.  Back and forth.  Relax them.  See you're pushing on me and you're going to irritate me and that's when I get upset.  And you know better than to do that because you know it's not good when I get upset.  So relax."

- "It doesn't hurt at this point." (yelling)

- "If I'm having to force, then you're forcing back.  I've asked you several times to relax.  Relax." (yelling)

- "Then try harder.  Move your hand.  It will help.  Move your hand.  That will help.  Put your hands together."

- "Almost, almost, almost there.  Almost there."

- "Your legs, your hips are locked.  Relax your hips.  Relax them.  I want to be able to go back and forth.  Relax.

- "Now move your hips down.  Move your hips down or you're going to knock me out and it's going to start all over." (yelling)

- "Move your hips down toward your chest.  Move your hips toward your chest.  Move your hips toward your chest." Thank you.  One more time." (yelling)

- "Stop crying and relax."

- "Let me just finish.  Let me get done.  Stop crying."

- "Relax.  It shouldn't take this hard for me to get in every time.  Now stop.  I'm gonna just move you back."

- "Put your hands down."

- "Relax, baby."

- "You don't want me to come out."

- "Be quiet and we get done."

- "Just relax.  We'll be done in a minute."

Based on the unique and overwhelming evidence in this case against appellant, we can conclude beyond a reasonable doubt that the trial court's admission of appellant's internet searches did not move the jury from a state of nonpersuasion to one of persuasion as to whether appellant sexually abused E.N. on two or more occasions during a period that was thirty days or more in duration and, thus, was harmless.  We overrule appellant's fourth issue.

### Cumulative Error

Appellant argues in his fifth issue that the trial court's errors cumulatively denied him a fair trial.  He focuses on the jury's inability to determine the credibility of E.N.'s testimony and her outcry because the jury was unable to see E.N.'s prior inconsistent statements or the internet searches she conducted regarding lying to the police.  He again argues that he was not able to meaningfully cross-examine E.N. because the trial court excluded the evidence that could have impeached her.  Appellant also reiterates that he was confronted with a manipulated recording and evidence from his phone that had been illegally obtained.  He concludes that, even if each individual error were harmless, the cumulative effect was harmful because it denied him his constitutional right to a fair trial.

As discussed in detail above, we have not found error in the trial court's decision to exclude a copy of the chat messages from E.N.'s Movie Star Planet

account, to exclude a copy of internet searches linked to E.N.'s Google account, or to admit the audio recording of sexual abuse.[2]  And, while we did find error in the trial court's decision to admit evidence found on appellant's phone, we have conducted a constitutional harm analysis as is required.  Because we have not concluded that the trial court committed more than one error, there is nothing for us to cumulate.  *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error.").

Appellant's fifth issue is overruled.

## Outcry Witness

In his sixth and seventh issues, appellant asserts the trial court erred in overruling his objection to the court's determination that McConnell (the forensic interviewer) was the proper outcry witness and, as a result, allowed inadmissible hearsay.  Appellant contends the proper outcry witness was E.N.'s mother, at least to the first incident of sexual abuse, and appellant's father, as to the last incident. Appellant further argues that the State failed to prove appellant's father was unavailable as an outcry witness because it did not attempt an out-of-state subpoena.

---

[2] Appellant does not include issues six and seven, which challenge the admissibility of the outcry witness's testimony in this issue.  Even if appellant had included those alleged errors in his argument that the cumulative effect of the errors at trial denied him a fair trial, our result would be the same based on our disposition of issues six and seven discussed below.

Article 38.072 provides an exception to the rule against hearsay in that it allows the admission of outcry statements if certain requirements are met. TEX. CODE CRIM. PROC. art. 38.072. One such requirement is that the designated outcry witness must be the first person eighteen years of age or older that the child victim told about the abuse. *Id.* art. 38.072, § 2(a)(3). To be considered the first outcry, the victim's statements must be more than a "general allusion of sexual abuse" and must describe the alleged offense in some "discernible manner." *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). We review the trial court's determination as to who is the proper outcry witness for an abuse of discretion. *Id.* at 92.

At the hearing, McConnell testified that, as far as she knew, she was the first adult to whom E.N. provided details of specific offenses. E.N. told her about the first time and last time it happened and included sensory details in her account. McConnell also testifed that E.N. told her mother about the first incident in the hallway where appellant tried to put his penis "in the hole" but then later told her mother it was a dream. E.N. also told McConnell that she talked to her grandfather (appellant's father) about the abuse but did not go into detail about what she told him.

E.N.'s mother testified that, in the fifth grade, E.N. disclosed sexual abuse by appellant. E.N. told her that appellant had "sexted her," which she thought meant that E.N. "felt like she was raped." When E.N.'s mother explained that would "really hurt" and that if he did that he was violating her, E.N. confirmed that is what

happened. E.N. did not share any other details and later said she must have been dreaming. Although E.N. played the recording for her mother, she never told her any further details of the sexual abuse.

E.N.'s mother also testified that she knew E.N. told appellant's father details about certain acts because he told her, but she was not asked to disclose those details to the court. Nor did defense counsel elicit testimony from E.N. or the police as to what E.N. may have described to appellant's father before he reported the abuse.

At the hearing, defense counsel asked the trial court to take judicial notice of the State's article 38.072 notice in which the State listed appellant's father as one of the outcry witnesses. As to appellant's father, the notice provides: E.N. told appellant's father that appellant "penetrated her vagina with his penis. She told [appellant's father] that [appellant] came inside of her or finished inside of her and that [appellant] has made unknown sexual contact with her prior to this incident." The notice provides no other details as to when or where this incident occurred and implies that E.N. did not tell him any details about any other acts of abuse. Therefore, although E.N. told both her mother and appellant's father that appellant sexually abused her, "it was not until [s]he spoke to the forensic interviewer that [s]he made all of [her] allegations and it became clear the sexual abuse involved multiple incidents for a period of thirty days or more." *Rodgers v. State*, 442 S.W.3d 547, 552 (Tex. App.—Dallas 2014, pet. ref'd).

Furthermore, the State explained that appellant's father was unavailable and uncooperative after he went back to Florida. One prosecutor represented, "We have made several attempts. I can't tell you exactly, but we have called several times. I know that [the other prosecutor] has called, actually spoken to him and has been blown off every single time saying that he doesn't have time to talk, which is not unexpected." The other prosecutor testified that appellant's father lived in Florida, and he wanted to talk to him to see if he was coming to trial because he would likely not be able to subpoena him. "Every time I would speak to him, he would tell me that he was busy and that he would call me back." The prosecutor tried four or five times to contact appellant's father in 2020, but he was not aware of any attempts his office made to serve a subpoena in Florida.

In reviewing a trial court's decision that the child's counselor was the proper outcry witness where the first people the child told about the abuse testified that they did not remember the child telling them anything, the Austin Court of Appeals explained, "We interpret the statute to mean that the 'first person' refers to the first adult who can remember and relate at trial the child's statement that in some discernible manner describes the alleged offense." *Foreman v. State*, 995 S.W.2d 854, 859 (Tex. App.—Austin 1999, pet. ref'd); *see also Creech v. State*, Nos. 05-09-00762-CR, 05-09-00763-CR, 2011 WL 1663040, at *2, 4 (Tex. App.—Dallas May 4, 2011, pet. ref'd) (not designated for publication) (relying on *Foreman* and concluding child psychiatrist was not proper outcry witness when she testified that

child did not make an outcry to her, she did not remember child making an outcry, and she had no notes of child making outcry).  Thus, several courts have explained that an adult who refuses to cooperate with the prosecution cannot be the outcry witness.  *Petty v. State*, No. 02-21-00130-CR, 2022 WL 4545532, at *5 (Tex. App.—Fort Worth Sept. 29, 2022, pet. ref'd) (mem. op., not designated for publication) (citing opinions of sister courts).  Here, the evidence supports a finding that appellant's father was uncooperative.

Based on the record before us, we conclude that the trial court did not err in determining that McConnell was the proper outcry witness under article 38.072.  The State laid the proper predicate and appellant failed to offer any evidence to the contrary.  *See Garcia*, 792 S.W.2d at 91–92; *see also In re Z.L.B.*, 102 S.W.3d 120, 120, 122–23 (Tex. 2003) (per curiam) (relying on *Garcia* and holding in a juvenile trial that, "once the prosecution has laid the initial predicate to establish an outcry witness, the burden shifts to the defendant to prove that the child made an earlier statement to another individual" that was more than just a general allusion to abuse).  Appellant's sixth and seventh issues are overruled.

## Modification of Judgment

In a single cross-point, the State contends that the judgment of conviction should be modified to reflect that E.N. was thirteen years old at the time of the offense, not fourteen.  We agree.

This Court has the power to modify a judgment to speak the truth when we have the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd) (en banc). The evidence showed that E.N. was thirteen years old at the time of the last incident of sexual abuse. Therefore, we delete "FOURTEEN (14) years" from the section of the judgment that provides, "The age of the victim at the time of the offense was . . ." and replace it with "THIRTEEN (13) years."

Our review of the record also shows that the judgment is lacking one of the prosecutor's names. Therefore, in the section titled, "Attorney for State," we add the name, "Geeta Singletary" before "Justin Dotzel."

## Conclusion

As modified, we affirm the judgment of the trial court.

/Craig Smith/
CRAIG SMITH
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
210668F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

JEFFREY MICHAEL WINEBERG, Appellant

No. 05-21-00668-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 366th Judicial District Court, Collin County, Texas Trial Court Cause No. 366-83346-2020.
Opinion delivered by Justice Smith. Chief Justice Burns and Justice Breedlove participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

> to delete "FOURTEEN (14) years" and replace with "THIRTEEN (13) years" from the end of the sentence in the judgment that provides, "The age of the victim at the time of the offense was . . . ."; and

> to add "Geeta Singletary" before "Justin Dotzel" in the section titled, "Attorney for State."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 14th day of June 2023.